UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JOHN DOE, | No. C22-00750-RSM |
| Plaintiff, | |
| v. | ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION |
| SEATTLE UNIVERSITY, | |
| Defendant. | |

THIS MATTER comes before the Court on Plaintiff's Emergency Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction (hereinafter, the "Motion"). Dkt. #3. The Court has reviewed the briefing of the parties. Having considered the briefing and determined that oral argument is not necessary, the Court now DENIES Plaintiff's Motion for the reasons set forth below.

**I. BACKGROUND**

Plaintiff John Doe is a sophomore undergraduate student at Seattle University majoring in kinesiology. Dkt. #3 at 3. He is a member of Seattle University's baseball team and was awarded a baseball scholarship by the University to offset the cost of his education. *Id.* at 3, 11. Defendant Seattle University is a private Jesuit university located in Seattle, Washington. *Id.* at 1. Prior to

ORDER
PAGE - 1

the incidents giving rise to this case, Plaintiff alleges he had no history of misconduct at the school. *Id.* at 13. Near the end of August 2021, Plaintiff met a fellow student (hereinafter the "Complainant"), who he claims went on to become his close friend and the two of them shared a tight knit friend group. *Id.* at 3. Both Plaintiff and the Complainant lived in on-campus housing during Fall Quarter 2021. *Id.* Plaintiff alleges he would regularly spend time at the Complainant's apartment with Complainant and her roommate, even staying overnight on multiple occasions. *Id.* Plaintiff further alleges that he and the Complainant would drink alcohol and attend parties together and, at all times, Plaintiff's relationship with the Complainant was platonic. *Id.*

On October 30, 2021, Plaintiff alleges that both he and the Complainant consumed multiple alcoholic beverages over the course of several hours while attending Halloween parties. *Id.* at 3–4. Plaintiff states that Plaintiff and the Complainant attended these parties separately. *Id.* Plaintiff claims he had a date, Witness F, accompanying him at these parties. *Id.* Around 2:00 AM the following day, the Plaintiff claims Complainant left one of the Halloween parties and walked over to Plaintiff's apartment after the two communicated via Face Time. *Id.* at 4. Plaintiff alleges that neither he nor the Complainant consumed any alcohol at the Plaintiff's apartment, but both were intoxicated. *Id.* Plaintiff recalls talking with the Complainant for approximately two hours before they fell asleep in Plaintiff's bed. *Id.* Plaintiff claims his roommate was out of town, and no other witnesses were present for this encounter. *Id.* Plaintiff alleges that he did not engage, or attempt to engage, in any sexual contact with the Complainant before falling asleep. *Id.*

On the morning of October 31, 2021, Plaintiff states he and the Complainant woke up in Plaintiff's bed. *Id.* Plaintiff alleges that the Complainant was fully clothed, and Plaintiff was wearing what he alleges are his usual sleep attire of shorts and no shirt. *Id.* Plaintiff then alleges he and the Complainant spent approximately 30 minutes talking and that they both sent photos of

ORDER
PAGE - 2

themselves together to friends over social media. *Id.* Plaintiff claims that he and the Complainant then joined some mutual friends for breakfast at the university dining hall. *Id.*

The next day, November 1, 2021, Plaintiff states he received a letter from the Office of Student Conduct and Integrity Formation notifying him of alleged Code of Student Conduct violations related to consuming alcohol on university premises while underage. *Id.* at 4–5. Plaintiff states that the hearing officer, Assistant Dean of Students Anton Ward-Zanotto, was the sole investigator and decision-maker regarding the alcohol violations. *Id.* at 5. Mr. Ward-Zanotto found Plaintiff responsible for the alleged alcohol violations, and placed Plaintiff on a "Disciplinary Warning," effective November 15, 2021, through November 15, 2022. *Id.*

On November 2, 2021, Plaintiff states that Defendant Seattle University issued a 90-day No Contact Directive preventing Plaintiff and the Complainant from communicating. *Id.* On November 5, 2021, Plaintiff claims he received a Notice of Allegations from the Office of Institutional Equity alleging that "on October 30, 2021 [Plaintiff] sexually assaulted [Complainant] in Bellarmine Hall located on the campus of Seattle University." *Id.* Specifically, that Plaintiff touched the Complainant's genitals and other body parts while she was asleep on the night of October 30 or October 31, 2021. *Id.* Plaintiff claims that the Notice letter stated that the alleged conduct could constitute a violation of Seattle University's "Policy for Complying with the Title IX Regulations/Title IX Final Rule Regarding Formal Complaints of Sexual Harassment" ("Title IX Policy"), which was enclosed with the Notice of Allegations outlining the rules in effect, including Plaintiff's procedural rights. *Id.*

Plaintiff states he was subsequently ostracized from his friend group, kicked out of his living quarters, and harassed by other students. *Id.* at 5. Plaintiff claims the situation at Seattle University became so hostile that he was forced to remove himself from campus. *Id.* at 6.

ORDER
PAGE - 3

Seattle University appointed a third-party investigator to handle the Title IX allegations against Plaintiff. *Id.*; Dkt. #9 at 2–3. Plaintiff complains the investigator did not interview several people identified by both Plaintiff and the Complainant and that the investigation and ultimate resolution of Plaintiff's Title IX hearing was delayed by several weeks due to Seattle University's oversight and neglect. *Id.* Plaintiff claims that as a result of Seattle University's delay, Plaintiff faces suspension and cancellation of his courses during the peak of his Spring quarter final exam period. *Id.*

Plaintiff's Title IX Hearing was scheduled for March 28, 2022. *Id.*; Dkt. #9 at 3. On March 21, 2022, one week before the hearing, Seattle University sent an email to Plaintiff informing him that it was going to follow the procedural rules outlined in *Victim Rights Law Center v. Cardona*, 552 F. Supp. 3d 104, 132 (D. Mass. 2021) (the "*Cardona* ruling") during his Title IX hearing, which would allow the University to consider statements from witnesses who do not participate in the live hearing. *Id.* Plaintiff complains that this was a departure from Seattle University's Title IX Policy, effective August 14, 2020, which states:

> If a witness does not submit to cross-examination, as described below, the decision-maker cannot rely on any statements made by that witness in reaching a determination regarding responsibility, including any statement relayed by the absent witness to a witness or party who testifies at the live hearing.

Dkt. #3-1 at 22.

Seattle University appointed Mr. Ward-Zanotto as the Hearing Officer and sole decision-maker in Plaintiff's Title IX Hearing, who, Plaintiff claims, was also the sole decision-maker in Plaintiff's Student Code of Conduct hearing. Dkt. #3 at 6; Dkt. #9 at 3. Plaintiff claims Mr. Ward-Zanotto, having previously served as the decision in Plaintiff's Student Code of Conduct hearing, was biased against Plaintiff. *Id.* Specifically, Plaintiff claims Mr. Ward-Zanotto gave Plaintiff's narrative of events zero credibility because of Plaintiff's alleged alcohol consumption on the night

ORDER
PAGE - 4

of the incident at issue in the Student Code of Conduct hearing. *Id.* at 6–7. Plaintiff alleges Mr. Ward-Zanotto's bias directly affected the outcome of Plaintiff's Title IX hearing. *Id.* at 7. At the conclusion of the Title IX hearing, Mr. Ward-Zanotto found Plaintiff responsible for sexual assault and sexual offense. Dkt. #3-1 at 74. Mr. Ward-Zanotto imposed the following sanctions:

- Suspension from the University until September 20, 2022.
- Administrative Hold
- Campus Access Restriction
- Disciplinary Probation from September 21, 2022 through September 21, 2023.
- Educational Sanctions due June 10, 2022 including:
    - Teaching Responsible Alcohol Choices (TRAC) 2
    - TRAC 2 Fee ($150)
    - Statement of Purpose

*Id.*

On April 29, 2022, Plaintiff appealed the decision, citing: (1) Procedural Error; (2) Actual Conflict of Interest; and (3) Substantially Disproportionate Sanctions. Dkt. #3 at 7. Seattle University dismissed Plaintiff's appeal. *Id.*

Following the issuance of the Title IX hearing decision, Plaintiff complains he has been subjected to bullying and harassment by the Complainant and her friends and that Seattle University has been dismissive of his related complaints. Dkt. #3 at 8.

On June 1, 2022, Plaintiff filed the instant Motion seeking a temporary restraining order prohibiting Seattle University from cancelling Plaintiff's classes for the Spring Quarter 2022 and Fall Quarter 2022 and compelling Seattle University to immediately reinstate Plaintiff and allow him to complete his final exams and papers for the Spring Quarter 2022 pending the outcome of his Complaint against Seattle University. Dkt. #3 at 20. Plaintiff further requests the Court grant a preliminary injunction enjoining Seattle University from canceling Plaintiff's classes for the Spring Quarter 2022 and Fall Quarter 2022; enjoining Seattle University from cancelling the

ORDER
PAGE - 5

credits earned by Plaintiff in the Spring Quarter 2022; and reinstating Plaintiff as a student in good standing pending the outcome of his Complaint against Seattle University. *Id.*

## II. DISCUSSION

### A. Legal Standard

The standard for issuing a TRO is the same as the standard for issuing a preliminary injunction. *See New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1347 n.2 (1977). Both a TRO and a preliminary injunction are "extraordinary remed[ies] that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "The proper legal standard for preliminary injunctive relief requires a party to demonstrate (1) 'that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (citing *Winter*, 555 U.S. at 20).

As an alternative to this test, preliminary injunctive relief is appropriate if "serious questions going to the merits were raised and the balance of the hardships tips sharply" in the moving party's favor, thereby allowing preservation of the status quo when complex legal questions require further inspection or deliberation. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011). However, the "serious questions" approach supports a court's entry of a TRO or preliminary injunction only so long as the moving party also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest. *Id.* at 1135. The moving party bears the burden of persuasion and must make a clear showing that he is entitled to such relief. *Winter*, 555 U.S. at 22.

### B. Likelihood of Success on the Merits

Plaintiff argues that there is a substantial likelihood that he will succeed on the merits of his claims that Seattle University engaged in conduct that constituted (i) a violation of Plaintiff's Fourteenth Amendment due process rights; (ii) breach of contract; and (iii) a violation of Plaintiff's rights under Title IX of the US Code.  For the reasons set forth below, the Court finds it unlikely that Plaintiff may prevail on the merits of his claims.

1. **Fourteenth Amendment Due Process Claim**

Plaintiff fails to demonstrate a likelihood of success on the merits of his procedural due process claim.  Plaintiff argues that Seattle University violated Plaintiff's procedural due process rights under the Fourteenth Amendment.  Dkt. #10 at 10. "In every due process challenge, the first inquiry is whether the plaintiff has been deprived of a protected interest in property or liberty." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (citing *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976); U.S. Const., Amdt. 14).  The Fourteenth Amendment states that "[n]o *state* shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any *state* deprive any person of life, liberty, or property, without due process of law." U.S. Const., Amdt. 14 (emphasis added).  Plaintiff's procedural due process claim against Defendant Seattle University, which is a private college and not a state actor, is thus not within the Fourteenth Amendment's bounds.[1]  As the Supreme Court has clarified, "the principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful."

---

[1] Plaintiff cites an unreported opinion from the United States District Court for the Western District of Tennessee dated June 14, 2019, as support for the assertion that a private college's actions trigger a violation of the Due Process Clause of the Fourteenth Amendment. Dkt. #3 at 11 (citing *Doe v. Rhodes*, No. 2:19-CV-02336-JTF-tmp (W.D. Tenn. June 14, 2019).  However, in that case, the plaintiff's procedural due process claim invoked due process concerns under Title IX and not the Fourteenth Amendment.  *See Doe v. Rhodes*, No. 2:19-CV-02336-JTF-tmp, slip op. at 9 n.4 (W.D. Tenn. June 14, 2019).

ORDER
PAGE - 7

*Shelley v. Kraemer*, 334 U.S. 1, 13 (1948); *see also Heineke v. Santa Clara University*, 965 F.3d 1009, 1014 (9th Cir. 2020) ("a private university, does not become a state actor merely by virtue of being required by generally applicable civil rights laws to ameliorate sex (or any other form of) discrimination in educational activities as a condition of receiving state funding.").

### 2. Breach of Contract Claim

Plaintiff has also not demonstrated a likelihood of success on the merits of his breach of contract claim. The existence of an enforceable contract is an essential element to a claim for breach of contract. *Fort Vancouver Broadcasting Corp. v. Fouce Amusement Enters.*, 933 F.2d 1013 (9th Cir.1991). Under Washington state law, a contract may be oral or written, and may be implied. *Hoglund v. Meeks*, 139 Wash.App. 854, 870, 170 P.3d 37 (2007). Parties must "objectively manifest their mutual assent and the terms assented to must be sufficiently definite." *Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wash.2d 171, 177–78, 94 P.3d 945 (2004). The party asserting the existence of a contract bears the burden of proving each essential element. *Becker v. Washington State Univ.*, 165 Wash. App. 235, 246 (2011). Plaintiff relies on *Anderson v. Vanderbilt Univ.*, 450 F. App'x 500, 502 (6th Cir. 2011) to support the existence of an enforceable contract between Plaintiff and Seattle University. However, in *Anderson*, the Sixth Circuit interpreted Tennessee law when it determined "a student may raise breach of contract claims arising from a university's alleged failure to comply with its rules governing disciplinary proceedings." *Anderson*, 450 F. App'x 500 at 502. Plaintiff does not cite to any Washington law, let alone any cases from the Ninth Circuit, or any specific language from Seattle University's Title IX Policy in support of his argument that the Title IX Policy created an enforceable contract between Plaintiff and the University. *See* Dkt. #3 at 14–15. Although it is possible that Plaintiff may be able to establish that this policy constituted an enforceable contract, it is not clear to the

ORDER
PAGE - 8

Court that Plaintiff has met the stringent standard for likelihood of success on the merits used on a TRO motion.

### 3. Title IX Claim

Finally, Plaintiff does not appear likely to succeed on the merits of his Title IX claim at this time. Title IX of the Education Amendments of 1972 is a federal statute designed to prevent sexual discrimination and harassment in educational institutions receiving federal funding. Title IX specifically provides: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX is enforceable through an implied right of action for monetary damages, as well as injunctive relief. *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 76 (1992).

Plaintiff asserts violation of Title IX under two separate theories of relief: erroneous outcome and selective enforcement as set out by the Second Circuit in *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir.1994).

#### a. Erroneous Outcome

To prevail on an erroneous outcome theory Plaintiff would ultimately need to prove the hearing was flawed due to his gender. *Yusuf v. Vassar College,* 35 F.3d 709, 715 (2d Cir.1994) (reversed on other grounds). Specifically, a plaintiff must allege "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary hearing" as well as "a causal connection between the flawed outcome and gender bias." *Yusuf,* 35 F.3d at 715. In *Yusuf,* the Second Circuit explained:

> If no such doubt exists based on the record before the disciplinary tribunal, the claim must fail. We do not believe that Congress meant Title IX to impair the independence of universities in disciplining students against whom the evidence of an offense, after a fair hearing, is overwhelming, absent a claim of selective enforcement.

ORDER
PAGE - 9

*Id.* Further, "a plaintiff must thus also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id*. Examples of these circumstances include "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.* Plaintiff has not provided any gender-biased statements or questions posed by university officials during the disciplinary hearing, nor has he alleged that Seattle University has had any issues with the Department of Education, in the past, or currently, that would require it to issue a harsh sanction. Instead, to establish Seattle University was motivated by gender bias, Plaintiff makes the conclusory statement, without citation or statistics, that "Defendant has made it a point to find a violation against male students in its Title IX investigations" and further points to a single article in Seattle University's student newspaper in which Seattle University was criticized for its handling of a Title IX complaint by one of its law students. Dkt. #3 at 16.[2] But allegations of an erroneous outcome "combined with a conclusory allegation of gender discrimination" cannot form the basis of Plaintiff's TRO request. *See Yusuf*, 35 F.3d at 715 (noting that a conclusory statement of gender bias is not sufficient to survive a motion to dismiss).[3]

b.  *Selective Enforcement*

To prevail on a selective enforcement claim Plaintiff must show that regardless of his guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was

---

[2] In its Response, Seattle University states that "including Plaintiff's proceeding, the university has processed two complaints under its Title IX Policy since the date of the article. *See* Moffit Decl. at ¶ 10.  One complaint is the subject of this litigation: the university found Plaintiff responsible for violating the policy.  In the second complaint, however, the university did not find the male respondent responsible for a policy violation, thus contradicting Plaintiff's entire argument. *Id.*" Dkt. #9 at 15.

[3] Plaintiff also points to Complainant's motivations.  Dkt. #3 at 16 ("Complainant was motivated in her actions by her peers, as well as her own malice, evidenced by her continued harassment of Plaintiff (which Defendant refused to even investigate).")  Further, Plaintiff alleges Seattle University "gave no weight to any male testimony," but in the same sentence qualifies this argument by stating Seattle University *did* give weight to a male witness' testimony supporting the Complainant's position.  *Id.*  The Court does not find that either of these arguments suggest gender bias was a motivating factor behind Seattle University's determination.

ORDER
PAGE - 10

affected by the student's gender.  *Yusuf*, 35 F.3d at 715.  Plaintiff argues that "Defendant's arbitrary imposition of a suspension, loss of classes, and subsequent probationary period…was the result of selective enforcement of Defendant's policy against male students" and that "[w]ith Defendant's reputation and Title IX funding at stake, Defendant pursued Plaintiff irrespective of his guilt or innocence, because he was a male student." Dkt. #3 at18.  To support Plaintiff's argument that Seattle University has a reputation which could put its Title IX funding at stake, Plaintiff cites to a single article about a rape that took place on the Seattle University campus by an "unknown male", however the article says nothing about mismanagement of the rape complaint by the University or anything else that may suggest a motive for Seattle University to impose more severe penalties for sexual assault allegations or pursue investigations into sexual assault without a basis and solely due to the student's gender.  *See* Dkt. #3 at 18 n.6.  Again, Plaintiff recites only conclusory assertions that Seattle University was motivated by Plaintiff's gender.  Plaintiff has not shown that he is substantially likely to succeed on the merits of his Title IX selective enforcement claim at this time.

C. Likelihood of Irreparable Harm

After examining a plaintiff's likelihood of success on the merits of their claims, the Court must balance those conclusions and findings with other factors, including the possibility that the denial of a TRO will cause irreparable harm to the plaintiff.

Plaintiff asserts that he will suffer irreparable harm absent injunctive relief because "by not allowing Plaintiff to complete his Spring 2022 Quarter coursework, and by not allowing Plaintiff to register for classes for the Fall Quarter 2022, Plaintiff will be unable to graduate on schedule, and will cause additional financial burdens upon Plaintiff in addition to the loss of his athletic scholarship." Dkt. #3 at 18–19.

ORDER
PAGE - 11

The Court agrees that the denial of a TRO here will likely cause Plaintiff some irreparable harm.  Seattle University's sanctions effectively denied him the benefit of the work already performed in the classes this quarter and will delay the completion of his degree.[4]  Finally, Plaintiff will forever have this disciplinary action on his academic record, which may impact his ability to enroll at another institution or affect his future career possibilities.  Thus, the Court finds this factor weighs in favor of Plaintiff.

### D. Balance of Equities/Public Interest

When considering the balance of equities and the public interest in this matter, the Court finds the factors do not warrant a TRO.  There is no question that there is a strong public interest in protection of our constitutional rights.  *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("it is always in the public interest to prevent the violation of a party's constitutional rights.").  However, as set forth above, Plaintiff has not established a strong likelihood of succeeding on his constitutional claims and the Court accordingly cannot reach the conclusion that the Policy in fact violates constitutional rights.  As such, Plaintiff cannot show that issuance of a temporary restraining order is in the public interest.

The Court also finds that it is in the public's interest that university officials should be afforded some level of deference in their disciplinary decisions and processes.  Issuing a TRO in this case, and in others similar to it, would likely interfere with Seattle University's ability to enforce its disciplinary standards and its ability to carry out its legal obligation under Title IX to respond to sexual harassment.  *See* Department of Education, Nondiscrimination on the Basis of

---

[4] In its Response, Seattle University argues that Plaintiff will have numerous opportunities to take all four courses Plaintiff was enrolled in during the Spring 2022 Quarter after he is reinstated in the Fall 2022 Quarter and as such "any harm Plaintiff would suffer from not completing his Spring Quarter 2022 courses is easily reparable".  Dkt. #9 at 17.  It is unclear to the Court how a missed quarter of credits (regardless of whether the classes will be offered in the future) will not affect his graduation date—a harm the Court does consider to be irreparable.

ORDER
PAGE - 12

Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,033 (May 19, 2020) ("these final regulations promote important policy objectives with respect to a recipient's legal obligations to respond to sexual harassment."). Absent facts or evidence showing a substantial likelihood of success on the merits, the Court is reluctant to interfere with Seattle University's disciplinary processes.

### E. Balance of Factors

In summary, the Court finds that Plaintiff has not demonstrated a substantial likelihood of success on the merits of his claims—the factor deemed most important to the Court's analysis. *See Dickinson v. Brown*, No. C17-868RSL, 2017 WL 6623054, at *4 (W.D. Wash. Dec. 28, 2017), *aff'd*, 731 F. App'x 696 (9th Cir. 2018) (citing *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015)). The Court also finds that the "balance of the equities" and "public interest" factors weigh against the issuance of a TRO at this juncture. Therefore, although Plaintiff may indeed suffer irreparable harm if Seattle University's sanctions against Plaintiff are allowed to stand, the Court cannot find that the factors, when balanced against each other, weigh in his favor. Accordingly, the Court concludes that the issuance of a temporary restraining order is not warranted in this instance.

### B. Alternate Test

Under the Ninth Circuit's alternative test for injunctive relief—that a movant has shown serious questions are raised and the balance of hardships tips sharply in its favor—the Court would reach the same conclusion as stated above for the same reasons. Accordingly, the Court concludes that Plaintiff has failed to meet either standard for injunctive relief at this time.

ORDER
PAGE - 13

## III. CONCLUSION

Based on the foregoing reasons, the Court hereby finds and ORDERS that Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, Dkt. #3, is DENIED.

DATED this 3rd day of June, 2022.

RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE